# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 17, 2004

## STATE OF TENNESSEE v. HOLLY LYNN PERRYMAN

**Direct Appeal from the Circuit Court for Marshall County**
**No. 15628     Charles Lee, Judge**

---

**No. M2003-03012-CCA-R3-CD - Filed May 2, 2005**

---

The defendant, Holly Lynn Perryman, was found guilty by a Marshall County jury of facilitation of aggravated robbery, a Class C felony, and was sentenced as a Range I, standard offender to four years and six months, with nine months to be served in the county jail and the remainder on probation, the first year of which was to be in community corrections. She raises two issues on appeal: (1) whether the evidence was sufficient to sustain her conviction; and (2) whether her sentence is excessive. Following our review, we conclude that the evidence is sufficient to sustain the conviction but that her conviction for this offense, which is a crime of violence, makes her ineligible for community corrections. Accordingly, we vacate her sentence and remand for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed and Remanded in Part**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

John H. Richardson, Jr., Fayetteville, Tennessee, for the appellant, Holly Lynn Perryman.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; William Michael McCown, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

### I. Proof at Trial

During the early morning hours of April 20, 2003, Danny Reeves, the manager of a McDonald's restaurant in Lewisburg, was robbed at gunpoint in the parking lot by a man identified

as Bobby Mosley,[1] who took the victim's briefcase and wallet, both of which contained approximately $6,000 belonging to the victim and McDonald's. When the police responded, Mosley fled from his vehicle parked in the nearby Kroger parking lot but was apprehended a short distance away. The vehicle sped off. Proof at trial established that the defendant drove the vehicle and was accompanied by a codefendant, Latisha Greer. Based on their investigation, the police concluded that the defendant was involved in the robbery.

Danny Reeves testified that he had been a full-time manager at McDonald's for a little over a year. He hired the defendant on November 17, 2002, and fired her on April 4, 2003, for failure to report for work. The defendant started as a "crew member" and was promoted to "swing manager," a job which involved responsibility for "[c]ash registers, deposits, [and the] safe." Approximately $2,000 was kept in the safe, and the defendant had her own combination and keys to the safe while employed there. About a week after the defendant was fired, she called Reeves, "screaming in the phone" and upset about being terminated. On April 19, 2003, Reeves closed the restaurant at midnight, the normal closing time for Saturday night. After finishing his managerial duties, he left the restaurant between 3:30 and 4:00 a.m. on Sunday morning, April 20, to take the deposits to the bank. In his briefcase, he placed two bank bags containing a total of $6,100, including cash and his payroll check which he had cashed from the deposits. He had nearly $1,000 in his wallet in his right back pocket. As he was leaving the restaurant and locking the door, he was approached by a masked man with a gun who asked him "if [he] wanted to die today." The robber backed Reeves into a corner, took his wallet from his pants' pocket, and picked up the briefcase. He walked Reeves across the parking lot at gunpoint to Reeves' car, forced him to lay on the ground, and told him to count to 100. When Reeves had counted to twenty-five, he looked up and saw that the robber was gone. He then ran back inside the restaurant and called 9-1-1. He did not see anyone other than the robber in the area. Later that morning, Reeves identified his briefcase, his wallet, the bank deposit bags, and the money which had been recovered by the police. He also identified the voice of the robber, Bobby Mosley, whom the police had apprehended. On cross-examination, Reeves stated that Latisha Greer had also worked at McDonald's for three days before she was fired.

Officer Scott Braden of the Lewisburg Police Department testified that he was dispatched to the scene of the robbery around 4:00 a.m., and Officer Steve Mitchell was there when he arrived. Mitchell gave him a description of the robber, and he located a subject fitting the description leaning on the driver's side window of a Camaro, which had its headlights on and motor running, sitting in a nearby Kroger parking lot. As Braden approached in his police cruiser, the suspect whom he identified as Bobby Mosley ran across the parking lot, briefcase in hand, but was apprehended a short time later by Braden and other Lewisburg officers and Marshall County deputies, including David Curley and Steve Mitchell, both of whom testified as to their roles in the investigation. Because of the lighting, Braden could not see how many people were in the Camaro, which took off when the suspect ran.

---

[1]Mosley was charged with aggravated robbery, and his trial was scheduled for November 2003.

Sergeant Barry Hargrove of the Lewisburg Police Department stated he located the Camaro involved in the robbery around 9:30 a.m. on April 20 at the nearby Ellington House Apartments. He confirmed that the Camaro belonged to Bobby Mosley and had the vehicle towed to the police department.

Lewisburg Police Officer Larry Hardin testified that he helped search Mosley's Camaro pursuant to a search warrant at the police department. Inside the Camaro, officers found a white plastic bag containing dark clothing, the victim's wallet, and a loaded .38 caliber pistol. They also found a woman's purse and a pocketbook containing Latisha Greer's photo identification.

Sergeant Jimmy Whitsett of the Lewisburg Police Department was in charge of the robbery investigation and interviewed Mosley, who gave three different versions of how he came into possession of the victim's briefcase and money. He testified that the defendant's mother lived about "200 or 250 yards" from the McDonald's. Whitsett testified that no identifiable fingerprints were obtained from Mosley's Camaro. The defendant provided an alibi, namely that she was at her home with her infant son and her boyfriend, Derrick Greer, on April 19 and 20. Sergeant Whitsett read aloud from the defendant's May 15, 2003, statement, which he had written and the defendant had signed, explaining her lack of involvement in the robbery:

> On April 19, 2003, I was at home with my boyfriend and baby. I was not with Bobby Mosley. I last seen Bobby Mosley a month or two ago. I used to be his girlfriend about two years ago. I last seen Tiffany O'Quinn two months ago. Did not help Bobby Mosley in no way robbing McDonalds. I last drove Bobby Mosley's car a month or two ago. I will take a polygraph test, and it will show that I had nothing to do with the robbery or have any knowledge of it. I never told or had a conversation with Latisha Greer about the robbery before or after. I used to work at McDonalds about three to four months ago, and Danny Reeves was my boss when I worked there. I have not been around Bobby Mosley for a couple of months. I have not spoken to him on the phone. Bobby never came to McDonalds to see me. He may have come to eat, but not to see me.

However, based on information provided to him by Latisha Greer, Whitsett talked to Shannon Perryman who told him that the defendant's infant son was actually with Christy Hayes, the defendant's cousin, in the early morning hours of April 20. Shannon Perryman and Latisha Greer were with the defendant when she left her infant son with Christy Hayes. Hayes confirmed to Sergeant Whitsett that she was babysitting the defendant's son on the morning of the robbery.

Latisha Greer testified that she and the defendant were roommates in April 2003. She was with the defendant and Shannon Perryman when the defendant left her son with Christy Hayes on April 19. Greer said she knew Bobby Mosley as "Bugsy," and he and the defendant had dated in the past. She said that she, Shannon Perryman, and the defendant went to Mosley's house after leaving the defendant's son with Christy Hayes. At some point early in the morning on April 20, Shannon Perryman left Greer and the defendant at Mosley's house. The defendant told Greer that Mosley was

going to take them to pick up the defendant's son around 1:00 a.m., and they stopped to get gas near the McDonald's. While Mosley was inside the gas station paying, the defendant told Greer that Mosley was planning to rob the McDonald's. Greer said that she had seen a pistol earlier in the morning on a table in Mosley's house. The defendant directed Mosley to the McDonald's to see if Reeves' car was in the parking lot and told Mosley to park at her mother's residence, which was nearby. Mosley stated, "It's cool; I can run from there." After parking near the residence, the defendant moved from the passenger's seat into the driver's seat and Mosley, wearing dark clothing, exited the vehicle. Greer and the defendant waited in the vehicle "two or three hours," until Mosley returned with a plastic bag and a briefcase and got in on the passenger side. Greer said that both she and the defendant knew there was going to be an armed robbery. On Mosley's urging, the defendant drove the vehicle to the nearby Kroger parking lot. Along the way, Mosley opened the briefcase which contained a money bag and a large sum of money. Shortly after they pulled into the Kroger parking lot, the police arrived and Mosley "took off running." At that point, the defendant drove away "in a hurry," and they left the vehicle at a nearby apartment complex. Greer and the defendant ran to "Lisa's" trailer, and by that time, it was completely daylight. Greer had realized at this point that she had left her shoes, pocketbook, and identification in Mosley's car. The defendant told Lisa that she had gotten into an argument with Derrick Greer and needed a ride. Lisa took them home, and the defendant called Christy Hayes around 7:00 a.m. and asked her to bring her son home, which she did. Later, Greer went to the police station and gave two statements to Sergeant Whitsett, the first of which she admitted was untrue. Greer acknowledged that she had a pending criminal responsibility charge.

Patricia Cozart testified she is the great aunt of Shannon Perryman and Christy Hayes, who are sisters. On April 19, the defendant and a "black girl" came to Cozart's house and spoke with Shannon Perryman and made some telephone calls. The next morning, April 20, Christy Hayes called Cozart and Cozart gave her the defendant's phone number.

Shannon Perryman testified that she lived with Patricia Cozart in April 2003 and that her half-brother is the defendant's father. On April 19, 2003, the defendant and Latisha Greer came to her house, and she called her sister, Christy Hayes, to ask her to babysit for the defendant. She, the defendant, and Greer took the defendant's son to Hayes around 8:30 p.m. and went to Bobby Mosley's house around 10:00 p.m. She and Greer later left, but the defendant remained at Mosley's. Around 1:00 a.m., Shannon Perryman and Greer returned to Mosley's to pick up the defendant, but the defendant said that Mosley was going to take her to pick up her son from Hayes at 2:00 a.m. Greer stayed with the defendant at Mosley's, and she went home. Later that morning, Greer and the defendant knocked on her door, and the defendant yelled, "[O]pen up, GD. Bobby run off and left us." However, Perryman did not answer the door.

Ray Hayes, Jr., the husband of Christy Hayes, testified that his wife babysat the defendant's son from around 7:00 or 8:00 p.m. on April 19 until 8:00 or 9:00 a.m. on April 20. Although the defendant had agreed to pick up her son at 2:00 a.m., she did not. Around 7:00 a.m., Hayes and his wife began calling around trying to locate the defendant but were unsuccessful. They took the

defendant's son home around 8:00 or 9:00 a.m. on April 20 after the defendant called to let them know she was at home.

Christy Hayes testified that she reluctantly agreed to babysit for the defendant on April 19. The defendant was with Latisha Greer and Shannon Perryman when she brought her son to Hayes and agreed to pick him up by 1:00 a.m. After the defendant called their house around 7:30 a.m., sounding "like she was drunk maybe" and saying she had just gotten home because Mosley "ran off and left us," they took the defendant's son home. She stated that the defendant and Bobby Mosley had dated in the past.

Lisa Hamlin testified that the defendant and Latisha Greer, barefooted and cold, came to her house between 6:00 and 7:00 a.m. one day in April 2003, claiming they had been put out of a car and needed a ride to town. She took them to the defendant's house. She could not remember the exact date this occurred but said it happened after her arrest for public intoxication on April 12.

Testifying for the defense, Derrick Greer said he had been dating the defendant for about two years and they have a son who was born on September 6, 2002. He stated he was at home all day with the defendant and their son on April 19 and 20. The defendant's mother called around 6:00 or 7:00 a.m. on April 20 and told them about the robbery. On cross-examination, Greer acknowledged that he was currently incarcerated and that the defendant had filed a petition for an order of protection against him on April 8, 2003, in which she complained that Greer had hit her in the chest, pushed her, broken her "stuff," and poured Coke and water on her. The order was served on Greer on April 13 and a hearing was set for April 23. The petition was later withdrawn by the defendant on April 30, ten days after the robbery.

Nancy London, the defendant's mother, testified that she called the defendant around 6:30 or 6:45 a.m. on April 20 to inform her of the robbery and that she could hear the defendant's son crying in the background. About an hour and a half later, she took some cigarettes to the defendant. Asked why she never provided this information to the police, either before or after her daughter was charged, London replied, "I knew it was my legal right, I didn't have to . . . . I never figured it would get this far."

Vickie Wilburn, an employee at the Shell Food Mart in Lewisburg, testified that Nancy London purchased cigarettes at the store before 7:00 a.m. on April 20, and she informed London of the McDonald's robbery. Tiffany O'Quinn, a friend of the defendant, testified that she did not take the defendant and Latisha Greer to Bobby Mosley's house on April 19, contrary to what Greer told police in her statement.

Bobby Mosley testified that he loaned his car to Latisha Greer and her boyfriend on April 19 in exchange for $100. Later, while at the Krystal's restaurant across the street from Kroger, Mosley saw Greer drive by in his vehicle, so he approached them in the Kroger parking lot to ask for the return of his car. Greer handed Mosley a briefcase and said, "The money is in here." Mosley assumed she was talking about the $100. Greer told Mosley she needed to take her boyfriend

"somewhere," and they left in the car, leaving Mosley afoot. He then walked to the front of the Kroger store and noticed that a police officer was following him. He eventually ran but was quickly apprehended. Mosley admitted removing money from the briefcase and putting it in his pockets and underwear. The last time Mosley had seen the defendant was "like three months before this Kroger incident."

Candace Daugherty, testifying for the State as a rebuttal witness, said that she and Derrick Greer have a son and that Greer stayed at her house from the time of the issuance of the defendant's order of protection until it was dismissed, which included April 19 and 20.

The defendant elected not to testify.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues on appeal that the evidence is insufficient to sustain her conviction for facilitation of aggravated robbery because there was "not enough credible testimony presented to establish guilt beyond a reasonable doubt."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The law regarding the offense of criminal responsibility for facilitation of a felony is set out in Tennessee Code Annotated section 39-11-403, which provides:

> (a) A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

> (b) The facilitation of the commission of a felony is an offense of the class next below the felony facilitated by the person so charged.

The Sentencing Commission Comments for this section state that:

> [This] section states a theory of vicarious responsibility because it applies to a person who facilitates criminal conduct of another by knowingly furnishing substantial assistance to the perpetrator of a felony, but who lacks the intent to promote or assist in, or benefit from, the felony's commission.

> A defendant charged as a party may be found guilty of facilitation as a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party.  The lesser punishment is appropriate because the offender, though facilitating the offense, lacked the intent to promote, assist or benefit from the offense.

Applying this statute in State v. Parker, 932 S.W.2d 945 (Tenn. Crim. App. 1996), this court held that before an accused can be convicted of facilitation of a felony, the State has to prove:  (1) the commission of a specified felony; (2) that the accused knew another person was going to commit a specified felony; and (3) that the accused knowingly furnished substantial assistance in the commission of the felony although the accused did not possess the requisite intent to be guilty of the felony.  Id. at 950-51.

In the present appeal, the evidence, in the light most favorable to the State, established that before the robbery the defendant was in the vehicle with Bobby Mosley and pointed out the victim's vehicle in the McDonald's parking lot.  When Mosley parked and exited his vehicle, the defendant told Latisha Greer that Mosley was going to rob the McDonald's.  Both Greer and the defendant had previously been employed at and terminated from the McDonald's.  Greer and the defendant then waited in the vehicle for two to three hours until Mosley returned.  When Mosley came back to the

vehicle and then ran from the police, the defendant drove his car quickly from the scene and hid it in a nearby apartment complex. Although the defendant called several witnesses in an effort to establish an alibi, namely that she was at home with her boyfriend and infant son, the jury, by its verdict, accredited the State's proof. We conclude that the proof easily supports the verdict.

## II. Sentencing

The defendant was convicted of a Class C felony and the parties agreed that she was a Range I, standard offender, making the sentence range three to six years. She argues that the sentence is excessive, "not appropriate under the facts as stated in the record," and asserts that she should have been allowed to serve her entire sentence on probation. She also challenges the trial court's application of enhancement factors.

At the sentencing hearing, Beth Ladner of the Department of Probation and Parole testified that she prepared the defendant's presentence report and that the defendant had a criminal record as a juvenile and was arrested for public intoxication as an adult while out on bond for the current charge. As a juvenile, while on probation, the defendant tested positive for marijuana and removed her electronic monitoring bracelet. She had also run away. On cross-examination, Ladner acknowledged that none of the defendant's juvenile convictions were felonies and that she was currently employed.

Danny Reeves testified that after the robbery, he had difficulty sleeping and was "very nervous" about going outside. About a week after the robbery, he went to see a doctor who prescribed anti-depressant medication which he was still taking. He also stated that he no longer closes the restaurant and that he "wholeheartedly believed that [he] was going to be shot" during the robbery. When Reeves fired the defendant shortly before the robbery, she had called and cursed him on the phone and was "very abusive."

The nineteen-year-old defendant testified that she was currently working as a part-time cashier at a grocery store and was the sole provider for her son. She said she had completed her community service work and paid all of the fines connected to her recent public intoxication conviction. She admitted to smoking marijuana until about two weeks before the sentencing report was prepared but refused to name the person with whom she had done so, saying that she and this person would smoke marijuana as they rode in a vehicle. She said that she never made any deposits when she worked at McDonald's because she did not have a car. She acknowledged that she had been on probation several times as a juvenile and had violated her probation more than once. She acknowledged that when she was sixteen years old and on "house arrest," she apparently cut a monitoring device from her ankle. She again denied any involvement in the robbery.

Benny Edwards, a co-manager at the Bi-Lo grocery store in Lewisburg, testified that he was the defendant's supervisor and that she had worked at the store "going on six months." During that time, the defendant "ha[d] done a very good job," arrived for work on time, and always called when

-8-

she was not able to work. He said she is "a very good employee" and has never been written up or had problems balancing her drawer.

According to the judgment, the defendant was convicted of the Class C felony criminal responsibility for facilitation of aggravated robbery, in violation of Tennessee Code Annotated section 39-11-403, and sentenced as a mitigated 30% offender to a period of four years and six months, with a nine-month period of incarceration in the Department of Correction, followed, as we understand, by supervision for one year by community corrections, the first six months were to be on house arrest, and the remainder of the sentence on probation.[2] Additionally, she was to pay costs and restitution beginning thirty days after "release" at the rate of $50 per month.

In setting the defendant's sentence, the trial court determined that no mitigating factors were applicable but applied three enhancement factors, two of which we understand to have been: (2), "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," and (16), "[t]he defendant abused a position of . . . private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense." Tenn. Code Ann. § 40-35-114(2), (16) (2003). As to factor (2), the court placed "considerable emphasis" on the facts that the defendant had been convicted of public intoxication committed while the charges which are the basis for the present appeal were pending and that she had continued smoking marijuana until two weeks before the presentence report was completed for sentencing in this matter. This behavior was given great weight in the court's assessing the defendant's "ability for rehabilitation," the court explaining that "any time that you have been on bond or you are awaiting a sentencing, if there is ever a time that you are going – to use the phrase that has been coined on occasion – 'to live at the foot of the cross,' it ought to be that time." As to factor (16), the court placed "considerable weight on the fact that this offense was facilitated because of the violation of a private trust," presumably because the defendant, as a former employee of the victim, had knowledge of his procedure for depositing restaurant receipts which facilitated the planning of the robbery. Apparently, the court applied, based upon the defendant's two separate convictions as a juvenile for simple possession of marijuana, enhancement factor (21), "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." However, the trial court was mistaken that the second conviction for simple possession would qualify as a felony if committed by an adult, Tennessee Code Annotated section 39-17-418(e) providing that a third, but not a second, conviction for simple possession of a controlled substance is a Class E felony. Accordingly, we conclude that only enhancement factors (2) and (16) are applicable.

---

[2]Although the judgment reflects the defendant as a mitigated 30% offender, the transcript of the sentencing hearing reflects that she was sentenced as a Range I, standard offender, and a subsequent order of the trial court corrected the judgment. Additionally, the transcript of the sentencing hearing reflects that the defendant was ordered to serve the nine months in the Marshall County Jail; however, the judgment form was mistakenly marked to show service of the nine months in the Department of Correction.

On appeal, the only issue raised as to this sentence is whether it is excessive. However, as we will explain, we conclude that, because a portion of the sentence was ordered to be served in the community corrections program, the sentence is illegal.

Initially, we note that this court has a responsibility to address the question of the illegality of the sentence. See State v. Braden, 867 S.W.2d 750, 764 (Tenn. Crim. App. 1993). The community corrections statute, Tenn. Code Ann. § 40-36-106(a)(1)(C), provides that those convicted of a violent felony are not eligible for the program, and subsection (D) makes ineligible those convicted of a felony involving the "use or possession of a weapon." The defendant in the present appeal was indicted for criminal responsibility for the conduct of another, to-wit, the commission by Bobby Mosley of the offense of aggravated robbery, accomplished by use of a handgun, and was found guilty of facilitation. Even though the defendant was convicted of a crime of violence, she still could be admitted into community corrections if she had special needs, as defined by Tennessee Code Annotated section 40-36-106(c), which provides:

> Felony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution, may be considered eligible for punishment in the community under the provisions of this chapter.

While there was proof presented during the sentencing hearing in this matter that the defendant had smoked marijuana and become intoxicated while this charge was pending, this evidence was used by the State in an effort to show the defendant should not receive probation. However, there was no claim made, or finding by the trial court, that the defendant has chronic alcohol, drug abuse, or mental health problems, so as to make her eligible as a special needs offender for the community corrections program. Accordingly, we conclude that the defendant is not eligible for the community corrections program and that her sentence is illegal. The record shows that the trial court carefully considered the facts of this matter and the sentencing principles in determining that the defendant's sentence should be four years and six months, of which she would be incarcerated for nine months. We conclude that the record fully supports this determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we vacate the defendant's sentence and remand for resentencing consistent with this opinion.

_____
ALAN E. GLENN, JUDGE